GORDON SILVER
THOMAS E. LITTLER, ESQ.
Arizona Bar No. 006917
E-mail: tlittler@gordonsilver.com
ROBERT C. WARNICKE, ESQ.
Arizona Bar No. 015345
E-mail: rwarnicke@gordonsilver.com
40 North Central Ave., 21st Floor
Phoenix, Arizona 85004
Telephone (602) 256-0400
Facsimile (602) 256-0345
[Proposed] Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| In re: <br><br> JB'S FAMILY RESTAURANTS, INC., <br> a Delaware corporation, <br><br> Debtor. | Case No.: 2:11-bk-04986-RTB <br><br> Chapter 11 |

**OMNIBUS DECLARATION OF LYNN WHITEFORD IN SUPPORT OF DEBTOR'S FIRST DAY MOTIONS**

I, LYNN WHITEFORD, declare as follows

1. I am over the age of twenty-one, have personal knowledge of the facts in this matter and, if called upon to testify, could and would do so.

2. I am the managing member of LBW Investments LLC ("LBW") which owns all of the stock in JB's Family Restaurants, Inc. ("JB's")

3. I am president, Chief Executive Officer, and a director of JB's which maintains its offices at 2207 South 48th Street, Suite A, Tempe, AZ 85282. In my capacity as President, I am familiar with the books and records of JB's.

4. On February 28, 2011, JB's will file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") and the company intends to continue in the possession of their properties and the management of their business as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

5. It is the best interest of all of the creditors and JB's for the company to continue operating effectively because a successful reorganization of the company is anticipated. In

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

order for JB's operations to continue effectively and to avoid the costly adverse effects of the Bankruptcy filing, JB's will request specific relief in "First Day Motions".

6. I submit this declaration in support of the First Day Motions.

**Background**

7. JB's offers a full service family restaurant style menu. JB's was originally founded in 1961 in Provo, Utah, as a Big Boy Franchisee. In 1987, JB's terminated its franchise relationship from the Big Boy Franchise System and began franchising its own concept in 1991.

8. Current management purchased JB's and Galaxy Diners from the Santa Barbara Restaurant Group in November 2000, through the acquisition of all the outstanding stock in JB's by LBW. LBW was formed by a management group from the JB's operations. LBW originally acquired 54 JB's Restaurants and 30 franchise units.

9. JB's business was hit particularly hard by the economic turmoil caused by the September 11, 2001 terrorist attacks. As a result, on March 7, 2002, JB's filed a voluntary petition in this Court for reorganization relief under Chapter 11 in 2:02-bk-03349-CGC. JB's confirmed a 100% payment plan of reorganization on October 23, 2003, and a final decree was entered on September 24, 2004.

10. JB's has worked diligently to meet its obligations under its previous plan of reorganization, but JB's is once again a victim of an economic downturn. The current recession has resulted in a decline in business which forces a bankruptcy petition.

11. As of the Petition Date, JB's operates 21 restaurants in six western states of Arizona, New Mexico, Idaho, Utah, Wyoming and Montana. The Company is comprised of 7 company restaurants and 14 franchised units.

12. JB's employs approximately 352 salaried and hourly employees. There are five employees located in JB's corporate office in Tempe, Arizona. All the other employees work in the 7 restaurants owned by JB's. All employees are paid bi-weekly through a payroll service.

13. As of December 30, 2010, the Debtor reported assets of $7,299,188.93 and liabilities of $10,298,630.33. The Debtor reported $15,761266.27 in revenues for 2010 and generated a pretax income of negative $442,261.96.

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

14. JB's is pursuing a plan to return to profitability by closing or franchising those restaurants that were unprofitable, terminating the costly leases on those facilities, and operating the remaining restaurants at a profitable level and collecting franchise fees. JB's has already reduced the number of restaurants it operates from 34 in 2007, to 7 as of today. JB's has also made substantial progress in reducing the overhead and operating expenses and improving profitability for all the restaurants.

15. The filing of this Chapter 11 proceeding was necessary as the final step in its plan to reorganize and return to profitability.

**Primary Debts**

16. JB's owes its primary trade supplier US Foodservice. JB's terms with US Foodservice is 28 days; however, JB's is behind and is currently paying at 52 days and has a substantial unpaid debt to US Foodservice, in addition to being behind on current invoices.

17. JB's has a number of leases on restaurants that were closed because they were unprofitable.

**Events Precipitating The Bankruptcy**

18. Revenues fell sharply as a result of the current recession and although the business has rebounded in the last several months, JB's is unable to continue without reorganizing under the Bankruptcy Code.

19. JB's fell behind on its trade debt with US Foodservice. JB's owes approximately $406,453.00 to US Foodservice.

20. JB's has lease obligations on many of the restaurants that it has closed. These lease obligations severely impact JB's cash flow. Lessors were unwilling to work with JB's to restructure the leases.

/ / /

/ / /

/ / /

/ / /

/ / /

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

3

**First Day Motions**

**Motion To Accelerate Hearing On First Day Motions And List Of First Day Motions**

21. The relief requested by the First Day Motions is necessary to avoid immediate and irreparable harm to the Debtor's business and a successful plan of reorganization. It is essential to the continued operation of the Debtor's business that the Debtor satisfies its current obligations.

**Application Approving Employment Of Counsel & Declaration Of Thomas E. Littler**

22. It is necessary that JB's have attorneys to represent and guide them through the Bankruptcy process. Bankruptcy counsel will be needed for:

    a. Attending meetings, negotiating with creditors and taking necessary actions to preserve JB's business and assets;

    b. Possible prosecution and defense of actions on behalf of JB's and handling negotiations concerning any litigation;

    c. Resolving objections to claims filed against JB's;

    d. Preparation of all matters necessary to the administration of the Bankruptcy; preparation and advocation of a plan of reorganization, disclosure, and all actions necessary to obtain confirmation of a plan;

    e. Appearances before the Court, any appellate court, and the United States Trustee and protect JB's property before such courts and the United States Trustee;

    f. Performance of all other necessary legal services and provide all other necessary legal advice to JB's in connection with the Chapter 11.

23. To the best of my knowledge, the attorneys of Gordon Silver do not have any connection with JB's, their affiliates, creditors, or any other parties in interest, or their respective attorneys and accountants, are "disinterested persons" as that term is defined in § 101(14) of the Bankruptcy Code, and do not hold or represent any interest adverse to the estate.

24. JB's has selected Gordon Silver as counsel because of the high quality of the firm and its extensive experience in commercial bankruptcies in this district.

/ / /

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

4

25. Gordon Silver has indicated a willingness to act on behalf of JB's.

**Motion To Maintain Existing Bank Accounts, Cash Management System, Business Forms And Letterhead, And To Honor Gift Certificates.**

26. JB's business involves, almost entirely, cash transactions and maintenance of the existing cash management system is critical. Closing the accounts would impair the efficient management of cash at a time when cash management is critical.

27. The network of the accounts for the various business facilities forms a stable centralized cash management system. The benefits of this system are the ability to (a) control corporate funds, (b) maintain effective internal controls on cash deposits, (c) invest idle cash, (d) ensure cash availability, (e) reduce administrative expenses, and (f) maintain positive employee and vendor relationships by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

28. JB's bank accounts and centralized cash management systems are complex and complicated. They have been established and designed specifically for the JB's operations and to meet its daily cash concentration and disbursement needs for multiple locations and entities.

29. Daily deposits are made by each of JB's restaurants into local deposit accounts ("Local Accounts"). All of the Local Accounts are with Wells Fargo branches.

30. Every night the Local Accounts at Wells Fargo branches are automatically transferred to a Concentration Account at Wells Fargo ("Concentration Account").

31. Daily credit card sales are processed by third parties and deposited directly to the Concentration Account by electronic transfer. All credit card sales come directly into the Concentration Account two business days after the purchase, with the entire weekend sales collected on Tuesdays.

32. The Concentration Account is debited daily by the amount of checks presented for payment on two accounts, a Payroll Distribution Account and a General Distribution Account.

33. At the end of every day, the Concentration Account is reduced to a zero balance by a transfer of any remaining funds into an Investment Account ("Investment Account"). The Investment Account at Wells Fargo is a type of short term cash investment account that provides

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

5

a small return of interest on the funds held. These funds are invested in the Wells Fargo Overland Express Sweep Fund which is currently earning less than one percent.

34. The daily balance of the Concentration Account is calculated following analysis of the amount of checks presented through the Controlled Disbursement Accounts. If additional funds are necessary to pay all of the checks presented for payment (whether for payables, benefits or payroll), funds are advanced from the Investment Account.

35. The amounts transferred to and from JB's Local Accounts, Concentration Account (Payroll Distribution Account and General Distribution Account) and Investment Account are accounted for and tracked by JB's. These amounts will continue to be tracked post-petition.

36. JB's does issue a small amount of gift certificates every year. JB's estimates that less than $2,000.00 in gift certificates are currently outstanding. It is in the interest of JB's, and all Creditors, for JB's to honor all outstanding gift certificates as they are presented after filing in order to keep up customer relations.

37. The Debtor believes that other than checks to employees, there are no other outstanding checks for pre-petition debts.

**Motion For Order Allowing Payment Of Pre-Petition Wages, Salaries And Employment Benefits And Directing Banks To Honor Pre-Petition Checks For Payment Of Pre-Petition Obligations.**

38. The Debtor's current workforce consists of 352 employees, comprised of full-time hourly employees, part-time hourly employees, and full-time salaried employees.

39. <u>Payroll</u>. Employees are paid every two weeks for a two-week pay period ending six days before a check is issued to the employee. The Debtor's current payroll period ends on February 24, 2011.

40. The Debtor employs a payroll processing service, ADP (the "Payroll Service"). The Debtor's payroll period ends every other Thursday. The next day (Friday), each store manager faxes to the corporate office the number of hours worked by hourly employees and gratuities accounted for by the Point of Sale system ("POS system"). The corporate office adds information relating to hourly and salaried employee vacations and any salary changes for salaried employee. By the following Monday, the Debtor transmits payroll information

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

6

electronically to the Payroll Service. The Payroll Service then calculates the amount of withholding taxes owed for each employee and deducts the employee's portion from each employee's gross pay. The Payroll Service also deducts any voluntary deductions for employee benefits, other benefits and withholdings.

41. On every other Wednesday, the Payroll Service issues a check drawn on the Debtor's Payroll Disbursement Account in the amount of each employee's net pay. The Payroll Service also sends withholding taxes to the relevant taxing authorities with funds drawn from the Payroll Disbursement Account. Checks are distributed to employees on the Thursday following the end of the payroll period. By this Motion, the Debtor seeks authority to distribute paychecks for wages earned between February 11, 2011, and the Petition Date. Such checks should be distributed on March 3, 2011.

42. All of the Debtor's employees were last paid on February 17, 2011. The Debtor's payroll for the pay period that ended on February 17, 2011, was approximately $193,000.00, including withholding taxes. There is usually some delay between the issuing of payroll checks and the employees negotiation of their paychecks.

43. Between the last pay period and the Petition Date, the Debtor closed 7 stores. The Debtor estimates that those store closures will result in a decrease in payroll expenses of approximately $2,190,000.00 per year.

44. The Debtor estimates that the total accrued prepetition wage claims, included un-negotiated payroll checks, is approximately $190,000.00 as of the Petition Date.

45. <u>Vacation</u>. The Debtor also allows vacation time for salaried and full-time hourly employees based upon years of service. Salaried full-time employees receive a set number of "vacation days." Instead of receiving actual payment for those days, the salaried employee merely receives time off with no decrease in salary. Full-time hourly employees receive "vacation pay" after working for the company for one year. On the first pay period following the anniversary of the full-time hourly employee's hiring date, the employee receives "vacation pay" in the amount of the average number of hours worked per week multiplied by the employee's current rate of pay, which amount is then multiplied by the number of weeks of "vacation pay" to

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

which the employee is entitled on account of the employee's length of employment.

46. Employees who are terminated before the anniversary date of their hiring may not collect vacation pay. Employees may not carryover unused vacation days from one annual period to the next annual period. The Debtor does not intend to pay this amount to employees but rather will continue to honor its current vacation policy in accordance with past practices.

47. Many of the Debtor's employees qualify for vacation pay and will become entitled to vacation pay as of the Petition Date. The Debtor estimates that pre-petition vacation pay claims will approximate $27,965.00 in the aggregate.

48. <u>Expense Reimbursements</u>. The Debtor also reimburses employees for business, travel, and other expenses. Historically, the Debtor has reimbursed total expenses of approximately $85,000.00 annually. Qualifying employees submit monthly expense reports with receipts and itemizations of expenses, which the Debtor then reimburses. The Debtor has reimbursed all expenses incurred through February 1, 2011. On February 23, 2011, the Debtor issued reimbursement checks in the amount of $4,109.95. The Debtor estimates the reimbursement expenses that have accrued between February 1, 2011, and the Petition Date will be approximately $2,000.00 and it is also possible that some previously issued reimbursement checks have not yet been negotiated.

49. <u>Directors' Fees and Expenses</u>. The Debtor does not owe any Director's fees or expenses that are not covered under the Expense Reimbursement category.

50. <u>Severance</u>. The Debtor has closed several stores recently and has terminated many employees, but the Debtor does not offer a severance package. The Debtor owes no money for severance.

51. The Debtor estimates the total amounts owed to employees as of the Petition Date on account of Prepetition Employee Wage Claims, expense reimbursements and vacation pay will be approximately $219,965.00.

52. The Debtor also provides other benefits to qualifying employees consistent with industry standards including medical and dental programs, workers' compensation coverage, a 401(k) matching program, flexible spending accounts, disability and life insurance.

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

8

102418-001/1140144.doc

53. <u>Health, Dental, and Other Insurance</u>. The Debtor offers several different insurance plans depending upon the state in which an employee resides. Qualifying employees may participate in one of four plans providing varying degrees of medical, prescription, dental, short-term disability ("STD"), accidental death and dismemberment ("AD&D"), and life insurance coverage (collectively, the "Insurance Plan"). The Insurance Plan is paid for partially through payroll deductions and partially by funding by the Debtor.

54. The Debtor fully insures its STD, AD&D and voluntary life policies through Cigna Life Insurance, its medical and prescription policy through United Healthcare, and its dental through Assurant Dental.

55. The Debtor also makes available a medical insurance policy for its hourly employees through Strategic Resource Company (SRC). The Debtor does not contribute to this plan. This is funded entirely by participating employees. As of the petition date, the Debtor has collected $23,170.46 through payroll deductions from the participating employees, which is past due and has not been paid to SRC.

56. The Debtor's plans also provide COBRA benefits.

57. The Debtor pays Cigna a lump sum premium of $1,581.38 per month. The Debtor funds all of the premium for basic coverage directly and payroll deductions of participating employees fund the remainder of the premium. As of the petition date the Debtor owed Cigna $9,488.28.

58. The Debtor pays a premium to United Healthcare on a monthly basis for the medical and prescription policies (the "Premium"). The Premium is approximately $14,353.34 per month, which may be adjusted upward or downward if employees change or drop coverage.

59. Employee payroll deductions account for approximately 33% of the medical, prescription drug, basic life, STD, AD&D and voluntary life plans. The Debtor funds the remainder of the plan.

60. The Debtor pays Assurant Dental a monthly premium for dental coverage based upon the number of employees enrolled in the dental plan. Presently, the monthly premium for the dental plan is $1,006.57 for all enrolled employees. That amount may increase or decrease

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

1  depending upon enrollment in the plan or termination of coverage by the employee.

2  61.  The Debtor does not pay any portion of the dental premium, the employee payroll deductions cover 100% of the dental premium.

62.  Based on historical information and experience, the Debtor estimates that it will have an accrued liability under the Insurance Plan in the approximate amount of $2,013.14 as of the Petition Date.

63.  <u>Workers' Compensation</u>.  Finally, the Debtor pays workers' compensation premiums to third party carriers for the benefit of Employees.  The Debtor fully insures its workers' compensation policy, and it has no liability for workers' compensation payments.  The Debtor is current on its premium payments for these programs as of the Petition Date.

64.  Based upon the foregoing, the Debtor believes that the total Prepetition Employee Benefit Claims (including unpaid premiums to third-party insurers and third-party costs of administering the benefit programs) accruing as of the Petition Date will be approximately $50,543.60.

65.  <u>Insiders.</u>  The owners of JB's through LBW are Lynn Whiteford 72%, William Boger 10%, Terry Hornbaker 5%, Mona Kollmorgen 3%, and with the remaining 10% held in trust.  Each of these individuals are also employees of the company.  No employee or employee insider is owed more that the $10,950.00 in 11 U.S.C. § 507(a)(4).  The Debtor's employees that are also insiders are not owed more than the $10,950.00 in Prepetition Employee Benefits Claims than would be a priority under 11 U.S.C. § 507(a)(5).

**Motion to Limit Notices to Certain Creditors**

66.  JB's has over 300 creditors.  It would be burdensome for the company to have to notice each creditor every time notice is required by the Bankruptcy Code.

**Motion To Allow Payment Of "Trust Fund" Taxes (Payroll & Sales)**

67.  The Debtor, in the ordinary course of its business, incurs various taxes, including withholding taxes.

68.  Taxes accrue as wages are earned and are calculated based upon a statutorily mandated percentage of gross wages employees earn.

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

10

69. The Debtor employs a payroll processing service, ADP (the "Payroll Service"). The Debtor's payroll period ends every other Thursday. The next day (Friday), each store manager faxes to the corporate office the number of hours worked by hourly employees and gratuities accounted for by the Point of Sale system ("POS system"). The corporate office adds information relating to hourly and salaried employee vacations and any salary changes for salaried employee. On the following Monday, the Debtor transmits payroll information via modem to the Payroll Service. The Payroll Service then calculates the amount of withholding taxes owed for each employee and deducts the employee's portion from each employee's gross pay. The withholding tax calculation also includes a determination of the amount the Debtor must contribute as an employer. The Payroll Service also deducts any voluntary deductions for employee benefits such as insurance, other benefits and withholdings.

70. On every other Wednesday, the Payroll Service issues a check drawn on the Debtor's Payroll Disbursement Account in the amount of each employee's net pay. The Payroll Service also sends withholding taxes (including the Debtor's contribution as an employer) to the relevant taxing authorities with funds drawn from the Payroll Disbursement Account. Checks are distributed to employees on the Thursday following the end of the payroll period. By this Motion, the Debtor seeks authority to distribute paychecks for wages earned between February 11, 2011, and the Petition Date. Such checks should be distributed on March 3, 2011.

71. All of the Debtor's Employees were last paid on February 17, 2011. There may be a few days delay between payday and the day at the employees negotiate their paychecks. The Debtor's payroll for the pay period that ended on February 10, 2011, was approximately $193,000.00, including withholding taxes or employer-paid benefits.

72. The Debtor collects approximately $32,000.00 in withholding taxes from its employees each pay period. The Debtor also pays approximately $18,000.00 in statutorily mandated employer contributions to payroll taxes.

73. The Debtor is current on all of the due and owing taxes relating to prepetition payrolls.

///

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

11

74. The Debtor has not paid certain state and local withholding taxes accruing prepetition, but due and owing postpetition, and certain federal withholding taxes on prepetition wages that are due and payable postpetition.

**Motion authorizing payment to Traveler's Insurance and to maintain insurance.**

75. The Debtor maintains certain insurance policies with Travelers Insurance Company of Hartford, CT. for property general and other liabilities, auto and workers compensation. Debtor is not current with these policies, but the policies have not yet been cancelled. The amount owing is $14,056.93. The Debtor seeks entry of an order confirming its authority, and/or authorizing it, to pay in the ordinary course of business all premiums related to these policies so that it can maintain insurance. The Debtor believes it will be more expensive and burdensome to purchase new polices than to keep the existing policies in place.

**Motion to Reject Leases**

76. The Debtor's business is the operation of family styled restaurants. Over the years the Debtor has entered into many leases for non-residential properties ("Leases"). Many of these Leases were made by the Debtor's predecessor in interest.

77. The Debtor continues to operate a number of restaurant locations on real estate where the premises are leased and the Leases are unexpired; however, the Debtor has also closed a number of restaurant locations on leased premises that were unprofitable. Many Leases simply have terms that the Debtor cannot meet with revenues generated at those locations.

78. The Debtor has closed a number of locations in order to return its business to profitability and enable it to continue operating restaurants at profitable locations. The locations were closed even though the Leases were not yet expired.

79. There are five non-residential real property leases involving just the Debtor and the Lessor. The Debtor has no need or desire to continue the leases at the following locations where it will no longer operate restaurants and the leases are burdensome to the Estate:

>Location: JB's # 31, 4795 West 3500 South, West Valley City, Utah.
>Lessor: Lee Family Trust Dated September 11, 2000.
>Leesee: JB's
>Signed: April 5, 2004.
>Expires: April 2024

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc

12

Current Base Payment Amount: $5,912.50.

Location: JB's # 49, 704 West Appleway, Coeur D'Alene, Idaho
Lessor: Hellen Shikany Trust
Lessee: JB's
Signed: December 12, 1994.
Expires: December 31, 2014
Current Base Payment Amount: $4,575

Location: JB's # 115, 2801 E. Main Street, Mesa, Arizona.
Lessor: Kenvin M. Jong Living Trust Dated March 9, 1995 (Successor in interet to Renee Templeraud).
Lessee: JB's (Successor in interest to JB's Big Boy Family Restaurants, Inc.)
Signed: July 2, 1979
Expires: December 14, 2014
Current Base Payment Amount: $4,755.00

Location: JB's # 168, 600 West F Street, Casper, Wyoming
Lessor: ERC Properties, LLC
Lessee: JB's
Signed: April 12, 2004
Expires: April 12, 2024
Current Base Payment Amount: $6,833.33

Location JB's # 342, 310 North Litchfield Road
Lessor: The Ledford Family Trust Dated April 9, 1999 and Glenalden, Inc.
Lessee: JB's
Signed: May 8, 2004.
Expires: May 8, 2024.
Current Base Payment Amount: $11,128.00

80. The Debtor has already vacated the premises.

81. The Debtor has one property that is a subleased. The Debtor closed its store and then subleased its interest in the property. Subsequently, another subtenant moved in without signing a new lease with JB's and without extending the sublease JB's had entered with its original subtenant that has now expired. The Debtor seeks to reject both agreements with respect to this location.

Location: JB's # 44, 1921 Caldwell Blvd., Nampa, Idaho
Lessor: John A. Williamson and Eveyln M. Williamson.
Subessor: Strand/Nampa GP, (Successor in interest to Strand Companies)
Sublessee Leesee: JB's (Successor in interest to JB's Big Boy Family Restaurants, Inc.)
Signed: April 10, 1974
Expires: March 31, 2029
Current Base Payment Amount: $5,000.

Location JB's # 44 1921 Caldwell Blvd., Nampa, Idaho
Sublessor: JB's

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

Sublessee: Jalepeno's Bar & Grill 208-442-6355
Signed: August 5, 2005
Expires: No lease agreement
Current Base Payment Amount: $4,000

82.  The Debtor has determined that in its best business judgment the rejection of the leases and subleases referenced above is in the best interest of the Estate.

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 28th day of February, 2011

      /s/ Lynn Whiteford
LYNN WHITEFORD

COPY of the foregoing mailed/
hand-delivered this 28th day of
February, 2011, to the following:

Office of the U. S. Trustee
230 N. First Avenue, Suite 204
Phoenix, Arizona 85003

By: /s/ SG Enniss

Gordon Silver
Attorneys At Law
Twenty-First Floor
40 N. Central Avenue
Phoenix, AZ 85004
(602) 256-0400

102418-001/1140144.doc